## SHELL PETROLEUM CORPORATION et al. v. WORLEY.

No. 28644.    May 9, 1939.

Rehearing Denied June 20, 1939.

Leon C. Phillips, Geo. W. Cunningham, Ralph J. May, W. D. Simms, John Ramsey, B. W. Griffith, Victor C. Mieher, and Alvin Richards, for plaintiffs in error

Geo. Crump, H. W. Carver, and W. L. Seawell, for defendant in error.

RILEY, J. This is an appeal from a verdict and judgment in favor of defendant in error in an action for damages alleged to have arisen from the pollution of a stream by salt water and oil permitted to escape from oil wells operated by defendants.

Plaintiff below, defendant in error, is the owner of 40 acres of land in Okfuskee county located in the valley of Deep Fork, a tributary of the North Canadian river, a little more than five-eighths of a mile south of the channel of said stream.

Defendants are the owners and operators of oil wells in oil field in Creek county some seven or eight miles north and west from plaintiff's land, and some 2½ miles north of Deep Fork. A small stream known as Euchee creek runs south from the vicinity of defendants' oil wells into Deep Fork. The oil wells have been operated since about 1924. It is admitted that salt water has been permitted to escape from said wells during that time and flow into Euchee creek. This stream flows only in wet weather. In dry weather the salt water flows into said stream and forms

pools. The water evaporates, leaving salt deposits.

Some 25 acres of plaintiff's land is subject to overflow from Deep Fork, and from a smaller stream flowing north near the east line of plaintiff's land, known as Hilliby creek.

In the fall of 1934, plaintiff set out 100 young paper shell pecan trees on that part of his land which is subject to overflow. He had several hundred native pecan trees on said land. About June 20, 1935, heavy rains within the watershed of Deep Fork caused an overflow of said stream, which, together with the water coming from Hilliby creek, overflowed that part of plaintiff's land upon which the pecan trees were growing. After the flood waters receded, nearly all the young paper shell pecan trees and a number of the native pecan trees died.

Plaintiff commenced this action for damages, alleging in substance that the salt water, oil, and other waste matter from defendants' oil wells killed said trees, causing decrease in the value of his land of $2,500.

Defendants answered by general denial, by plea of the statute of limitations, and some of the defendants affirmatively alleged that if plaintiff's lands were damaged as alleged, such damage was due to natural causes and not the acts of said defendants.

The issues were tried to a jury, resulting in a verdict and judgment for plaintiff in the sum of $500, and defendants appeal.

The sufficiency of the evidence to sustain plaintiff's cause of action was questioned.

The first proposition presented is that the verdict cannot stand because plaintiff failed to establish a causal connection between the alleged pollution and the injury received. Thereunder it is contended that, though it be conceded that defendants permitted salt water to escape from their wells and flow into Euchce creek, and from there into Deep Fork, that under the uncontradicted evidence there was not enough salt in the water at flood stage to kill or even injure the trees.

Where plaintiff's land lies, the water flowing down Deep Fork was more than one and one-half miles wide, and over the bottom land was in places nearly ten feet deep. One witness testified that when the river was at that stage, or at any stage sufficient to overflow the banks of the river, the water tasted salty. That it contained some salt must be conceded.

The real question is whether the water which overflowed plaintiff's land contained salt in sufficient quantity to kill or injure the trees.

There is evidence tending to show that the young pecan trees might have died from one of two or three causes aside from the effects of salt water, such as extreme dry and hot weather after the flood, or that they might have been set too deep, or that they may have died from the ravages of leaf worms.

Dr. Horace J. Harper, Professor of Soils at Oklahoma A. & M. College, was produced as a witness on behalf of defendants, and testified, in substance, that he made analysis of samples of soil taken from plaintiff's land; that the amount of salt found therein was the amount ordinarily found in normal soil; that there was not sufficient salt content therein to interfere with plant growth. There was no analysis of water in Deep Fork taken when the stream was at flood stage. There was evidence of analysis of the water taken from Deep Fork at various times when the stream was at normal stage. The most salt content shown by any of these tests was 410 parts of salt per million, and all the expert witnesses testified that this amount of salt was not sufficient to render the water injurious to plant life, or render it unfit for human consumption.

There is also evidence to the effect that the volume of water flowing down Deep Fork when at flood stage sufficient to overflow plaintiff's land, as was the case in June, 1935, would be about 140 times the volume at normal stage. Thus the salt content in such flood stage could hardly be more than three parts salt per million. According to all the expert witnesses, less than 1,000 parts salt per million is regarded as negligible salt content; generally, from 1,000 to 4,000 parts per million salinity is considered as being too weak to affect the least hardy crop plants.

All the expert evidence is that the saline content in the water of Deep Fork at flood stage could not have been sufficient to kill or even injure the pecan trees, and after the flood the saline content in the soil of plaintiff's land was no greater than is found in the average soil. This evidence stands without substantial contradiction. Against it is the evidence of one witness, Henry Musgrove, whose farm is located within the overflow area of Deep

Fork, about three-quarters of a mile above plaintiff's land. He testified in substance that the water which overflowed his land in 1935 tasted salty. But there is also uncontradicted evidence to the effect that in the flood of June, 1935, the overflow water on plaintiff's land was further diluted by water from Hilliby creek, the stream flowing into Deep Fork from the south and along the east side of plaintiff's land. This stream was shown to contain no salt content. The water from that stream was shown to contain no salt content. The water from that stream was the first to overflow plaintiff's land. Necessarily the flood water on plaintiff's land must have contained less salt than that which overflowed Musgrove's land, and the most that was said of that was that it was "salty" or "salt".

In DeGarza v. Magnolia Pet. Co. (Tex. Civ. App.) 107 S. W.2d 1078, it is said that the court would not take judicial notice that salt water was poisonous to cattle, but: "It occurs to us it would depend on the amount of salt in the water."

The court there held in substance that proof that water contained some salt was not sufficient to prove that such water was poisonous to cattle. The same may be said of the evidence in this case. The mere fact that water overflowing the bottom land adjacent to Deep Fork, and which overflowed plaintiff's land, contained salt and tasted "salty," is not proof that the salt in the water killed the pecan trees. Certainly not in the face of the uncontradicted evidence of the expert or scientific witnesses, skilled in the analysis of water, to the effect that the water could not contain more than three parts salt per million, which could not be harmful to plant life.

Under the uncontradicted evidence in this case, what caused the pecan trees on plaintiff's land to die is and was nothing more than mere speculation or conjecture. There is evidence in this case, and it is common knowledge that trees die from many causes. Magnolia Pet. Co. v. Dexter, 177 Okla. 153, 57 P.2d 1155. In the latter case it is said:

"Plaintiff's evidence was limited merely to testimony of the dead and injured trees and the floods. We do not believe that this was sufficient. Trees die from many causes and the mere fact that dead trees have been found on land that had been flooded a few times in a period of years does not seem sufficient to justify a jury guess that the flooding caused the death of the trees. That one event follows another is seldom sufficient in itself to show that the first is the cause of the second."

There, plaintiff's witness testified that 50 or more of his trees were killed, and others injured, by salt water going on the land in three different floods. In this case there was but one flood, and but one witness testified that the flood water "tasted salty" or of "salt."

In this case not a single witness ventured an opinion that the pecan trees on plaintiff's land died because of salt contained in the water which overflowed his land in the flood of June, 1935.

Not a single witness testified or expressed an opinion that the water which overflowed plaintiff's land in June, 1935, contained sufficient salt to render it injurious to plant life of any kind. As stated before, one witness did testify that the water at his place, about three-fourths of a mile above plaintiff's land, tasted salty. There is evidence that the average person can detect the taste of salt in water which contains 500 parts salt per million, or less than half the minimum amount necessary to render it injurious to plant life.

Plaintiff cites a number of cases, by this court, which he says were tried exactly like the instant case, where judgments for plaintiffs were affirmed. These cases are: Avery v. Wallace, 98 Okla. 155, 224 P. 515; Pulaski Oil Co. v. Edwards, 92 Okla. 56, 217 P. 876; Indian Terr. I. O. Co. v. Klaffke, 178 Okla. 62, 61 P.2d 669; Union Oil & Mining Co. v. Bowman, 144 Okla. 54, 289 P. 296. He also cites a number of cases which he says were tried exactly like the instant case, but judgments for plaintiffs in those cases were reversed. The cases cited are in point on the question of measure of damages and support the instruction given in this case on the measure of damages. But no point is made that the trial court erred in its instruction on the measure of damages. The real question is whether there is sufficient evidence that salt water escaping from defendants' wells caused the damage to plaintiff's land. In none of the cases cited by plaintiff was the question raised that the salt water or other poisonous substances in the water flowing over the land was insufficient to cause the injury.

We are inclined to the view that when defendants produced evidence to the effect that all the salt water which was allowed to escape from their wells and flow into Deep Fork river, together with that coming from other sources ordinarily found in

practically all streams in Oklahoma, did not produce a saline content of more than 410 parts per million when the stream was at normal stage, and not as much as four parts per million at flood stage, and this evidence was uncontradicted, the evidence as a whole was such as to render it a matter of speculation or conjecture as to what actually caused the pecan trees on plaintiff's land to die.

It cannot be said that the evidence as a whole is such as to make it appear more probable that salt escaping from defendant's wells killed the trees than that they died from some other cause. The evidence is insufficient to point out or show a causal connection between the wrongful acts of defendants and plaintiff's injury.

There is no substantial evidence whatever that the soil of plaintiff's land was permanently injured by the salt water or other poisonous substances from any source.

The verdict of the jury, under the evidence as a whole, was necessarily based upon speculation or conjecture, and cannot be permitted to stand. Phillips Pet. Co. v. Davis, 182 Okla. 397, 77 P.2d 1147; Midco Oil Corp. v. Hull, 182 Okla. 21, 75 P.2d 1126; Pine v. Bowles, 179 Okla. 604, 66 P.2d 1077; Hepner v. Quapaw Gas Co., 92 Okla. 9, 217 P.2d 438.

The verdict is set aside and the judgment based thereon is reversed.

WELCH, V. C. J., and OSBORN, CORN, GIBSON, and HURST, JJ. concur. BAYLESS, C. J., and DAVISON and DANNER, JJ., absent.